**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION**

| | |
|---|---|
| **SWEET ONION CHRISTIAN LEARNING CENTER**, **INC.,** and **GADY YOUMANS,** *Plaintiffs,* v. **VIDALIA CITY SCHOOLS, SANDY REID,** in her official and personal capacities as Superintendent of Vidalia City Schools, and **ANDY BLOUNT, SADIA AJOHDA, BRITTNEY BLACK, FRED GODBEE, and JULEE TORRANCE,** in their official capacities as members of the Vidalia City Board of Education, *Defendants.* | Civil Action No.6:26-CV-00026-RSB-CLR |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Since 2015, Reverend Gady Youmans has faithfully provided off-campus religious instruction to students at Vidalia High School ("Vidalia High") through a released-time education program. In this program, students at Vidalia High are "released" for part of the school day to take religion courses at Rev. Youmans' ministry, the Sweet Onion Christian Learning Center (the "Center"). The Center provided this instruction without issue until Rev. Youmans committed an act the Vidalia City Board of Education (the "Board") found intolerable—he criticized a proposed tax increase.

1

In September 2025, Rev. Youmans made two posts to his Facebook account critical of a Board-proposed tax increase to fund Vidalia City Schools. Shortly after he did so, Defendant Sandy Reid, Superintendent of Vidalia City Schools, recommended to the Board that it terminate Rev. Youmans' and the Center's released-time education program. She gave two reasons, each arguably more unlawful than the other: (1) Rev. Youmans' Facebook posts upset others, and (2) his instruction "reflected a particular interpretation of the Bible" and wasn't presented in a "neutral" manner. The Board accepted Superintendent Reid's recommendation and terminated the released-time education program with Vidalia High.

Vidalia City Schools, Superintendent Reid, and the Board (collectively the "District") may disagree with Rev. Youmans' position on taxes and his religious viewpoint. But the District may not punish him and his ministry for expressing those views or for providing religious instruction. In so doing, it violated the First Amendment.

Rev. Youmans and the Center respectfully ask the Court to vindicate their First Amendment rights and enter a preliminary injunction requiring the District to reinstate the released-time education program. To obtain a preliminary injunction, Rev. Youmans and the Center must demonstrate (1) a likelihood of success on the merits of their claims, (2) irreparable injury, (3) the balance of harms tips in their favor, and (4) an injunction is in the public interest. *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 860 (11th Cir. 2020). Because the District retaliated against them for protected speech and religious exercise, Rev. Youmans and the Center are likely to succeed on the merits of their claims. And they are currently suffering irreparable harm through the deprivation of their First Amendment rights. Protecting constitutional rights tips the balance of harms and public interest in Rev. Youmans' and the Center's favor, and they are thus entitled to preliminary relief.

## FACTUAL BACKGROUND

**I.   Rev. Youmans and the Center provide Christian education to students in Toombs County, Georgia.**

Rev. Youmans is an ordained minister in the Southern Baptist Convention. V.C. ¶ 32.[1] In 2013, he founded the Center to pursue a calling in educational ministry, and he currently serves as the ministry's Executive Director and Lead Teacher. *Id.* ¶¶ 14, 34. The Center provides "released-timed" education to students at Vidalia High School, a public school in Vidalia, Georgia. *Id.* ¶ 41. "Released-time" education is a program that allows public schools to release students for part of the school day to attend religious instruction with parental approval. *Id.* ¶ 36. In 2014, Rev. Youmans presented a proposal to the Board for the Center to provide released-time education to students at Vidalia High, which the Board approved. *Id.* ¶¶ 43–45. The Center has provided released-time education to students at the school ever since. *Id.* ¶ 46.

Rev. Youmans teaches five classes to Vidalia High students through the Center: Survey of the Old Testament, Survey of the New Testament, Comparative Religions, Biblical Finances, and Biblical Psychology. *Id.* ¶ 50. Rev. Youmans developed the curriculum for each course, and he teaches from an evangelical Christian perspective. *Id.* ¶¶ 64, 72. Students sign up for Center courses the same way they do any other Vidalia High course, except they must also receive parental consent. *Id.* ¶¶ 52–53. Rev. Youmans teaches the courses at a church near Vidalia High, and he shuttles students to and from the church during the school day for classes. *Id.* ¶¶ 58–59. Students who pass Center courses earn elective credit toward their graduation requirements. *Id.* ¶ 56.

---

[1] Rev. Youmans' Verified Complaint provides the evidentiary basis for his request for preliminary injunctive relief in the same manner as a supporting declaration. *See Stallworth v. Tyson*, 578 F. App'x 948, 950 (11th Cir. 2014).

Students often take the Center's courses to expand their understanding of Christian doctrine and grow in their faith in Jesus Christ. *Id.* ¶ 69. They frequently report that the Center helped them achieve these objectives, find encouragement in challenging times, prepare for a career in vocational ministry, and achieve financial goals. *Id.* ¶ 95. Neither a parent nor the District has ever complained to Rev. Youmans about the Center. *Id.* ¶¶ 102–03. A parent removed a student from a Center course only once in 2019 or 2020—after learning that the Center does not exclusively use the King James Version of the Bible. *Id.* ¶¶ 100–01. The most serious "complaint" Rev. Youmans has ever received from a student is that the courses were too difficult. *Id.* ¶ 106.

Aside from having permission to teach Vidalia High students, the Center operates independently of Vidalia High. The District doesn't pay or provide any resources to Rev. Youmans or the Center for the released-time education. *Id.* ¶ 84. It has never entered into a written contract with Rev. Youmans or the Center. *Id.* ¶ 81. It has never reviewed or overseen the Center's curriculum. *Id.* ¶ 86. And Rev. Youmans does not have access to Vidalia High's premises or its student information system. *Id.* ¶¶ 85, 88. Rev. Youmans' contact with the school is limited to providing grade and attendance information and coordinating course schedules with the guidance counselors. *Id.* ¶ 90.

**II.    Rev. Youmans criticized a proposed tax increase.**

In September 2025, the Board proposed increasing property taxes to fund District operations. *Id.* ¶ 117. Rev. Youmans opposed the tax increase. *Id.* ¶ 118. He believed it would unnecessarily burden families in the area, as the District was already overspending on administration. *Id.* ¶ 122. To voice these concerns, on September 12, 2025, Rev. Youmans posted the following two posts on his Facebook account:



**Gady Youmans**
Sep 12, 2025 · 🌐

Hello Vidalia, thank you for wanting to RAISE PROPERTY TAXES. City school board, please stop. You don't need more money. Just stop. Please. Property values are ticking down, so to make up for your budget shortfall you raise the rate. STOP. So many of my teacher friends in Vidalia have told me "The BoE office keeps hiring admins we don't need with near $100,000 salaries." Can we just cut one or two of them and not need the increase?



**Gady Youmans**
Sep 12, 2025 · 🌐

Vidalia City Schools raising property taxes... BUT, last year the Top 20 Highest paid employees made a combined $2.2Million dollars. 17 admins, 2 coaches, 1 teacher. I'm 💯 okay with qualified people making a good living doing a great job. BUT... this is the top 20 of over 400 people paid last year. This is also SALARY. This doesn't include health insurance, pension/retirement, and around 2-3 months off each year.... there are 400 ppl paid last year. Thats roughly 1 employee per 6-7 students.... ALSO doesn't include "contracted labor" for a host of things for people not directly employed by the system thus not public record.

V.C. ¶¶ 119–20. Rev. Youmans replied to a comment on the second post as follows:



**Justin Braddy**
2.2 million and not a single child educated. It's a shame really.

28w    Like    Reply    Hide

**Gady Youmans**
**Justin Braddy** wait until the 2024-25 numbers hit... its gonna be bigger. My students told me today "We have to teach ourselves in several classes. You actually teach."

28w    Like    Reply                    2 😮

V.C. ¶ 121. His intent for this comment was to vent frustration with the proposed tax increases, which he believed would exacerbate bureaucratic bloat that stifles the creativity and effectiveness of Vidalia High's teachers. *Id.* ¶ 122.

### III. The District retaliated against Rev. Youmans and the Center because of their speech.

On February 5, 2026, Superintendent Reid emailed Rev. Youmans that the District would no longer permit the Center to operate the released-time education program for Vidalia High students. *See* Ex. A. Since Rev. Youmans had not received any complaints from students, parents, or District staff about the Center, he was shocked. V.C. ¶ 126. So he met to discuss the matter with Superintendent Reid on February 19, 2026. *Id.* ¶ 127.

Superintendent Reid began by explaining that she had decided to no longer allow the Center to provide released-time education to Vidalia High students, and that the Board had voted to approve the decision. Ex. B at 3:1–2.[2] According to her, several District staff members and families complained to the board about Rev. Youmans' comments on Facebook regarding the effectiveness of teachers within the school system. *Id.* at 3:2–5. Specifically, she identified posts that discussed the "tax issue" and that said Vidalia High teachers "don't even teach," which many people found offensive and "attacking to the school." *Id.* at 4:16–5:7. She was describing the posts listed above. *Supra* § II.

Superintendent Reid said staff members were highly offended, so the Board asked her to review different options, discerning a "misalignment" with the Center based on Rev. Youmans' posts. Ex. B at 3:12–17, 22:9. Superintendent Reid said she started a committee within Vidalia High to review alternatives to the Center. *Id.* at 3:17–19. Upon review with the committee, she said she recommended to the Board that Rev. Youmans and the Center no longer be permitted to provide released-time education because Rev. Youmans' Facebook posts upset District staff and community members, and the Board agreed. *Id.* at 23:19–24:6.

---

[2] Rev. Youmans made an audio recording of his February 19 meeting with Superintendent Reid. A true and correct transcript of the recorded meeting is Exhibit B. Georgia is a one-party consent to record state. Ga. Code § 16-11-66(a).

Rev. Youmans then pressed Superintendent Reid to explain how his Facebook posts could justify this decision; only then did she pivot to saying there were "multiple reasons." *Id.* at 11:4. But the only other reason she gave was that parents in the past had difficulties "accepting some things" and pulled their children from the Center courses. *Id.* at 9:15–10:2. The only time a parent had ever removed a child from a Center course, however, was in 2019 or 2020 after a parent learned that the Center did not exclusively employ the King James Version of the Bible. V.C. ¶ 100–02. When Rev. Youmans told Superintendent Reid that this had occurred only once at another school, Superintendent Reid said she did not want to "get into teasing apart." Ex. B at 10:3–6. She confirmed in the meeting that the decision had nothing to do with the Center's material, funding, transportation, or safety. *Id.* at 10:16–17, 36:12–15. She also stated that, as an alternative to the Center, students could take dual credit courses at Brewton-Parker Christian University, a local Christian institution. *Id.* at 7:19–8:2.

Superintendent Reid's explanation to Rev. Youmans largely tracks the minutes of a Board work session where Superintendent Reid discussed the Center with the Board. Those minutes state:

> . . . [Superintendent Reid] noted that parents have previously expressed concerns about the course content, specifically a perception that some instruction reflected a particular interpretation of the Bible rather than presenting information in a neutral or well-balanced manner. A few parents have chosen to remove their children from the class for this reason, though the majority of enrolled students complete the course. She also reported a recurring concern related to the instructor, who has publicly expressed criticism of public schools and has posted negative comments about the district and staff on social media. The Board briefly reviewed these issues and inquired about possible options for the course. Superintendent Reid stated that she will continue gathering information and will provide an update at an upcoming Board meeting.

V.C. ¶ 154.

While the Center is currently teaching its courses for the Spring 2026 semester, Vidalia High students are unable to register for Center courses for Fall

2026 or Spring 2027. *Id.* ¶ 163. The District's actions have humiliated Rev. Youmans and the Center and damaged their reputations in the community. *Id.* ¶ 176. And Rev. Youmans' and the Center's primary income source consists of private donations. *Id.* ¶¶ 171–72. If the Center is unable to provide released-time education during the next school year, its donations are likely to dry up, which would force it to close. *Id.* ¶ 171.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show (1) "it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues;" (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party;" and (4) "if issued, the injunction would not be adverse to the public interest." *Otto*, 981 F.3d at 860. In First Amendment cases, the likelihood of success on the merits is the "most important preliminary-injunction criterion." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). That's because "an ongoing violation of the First Amendment constitutes an irreparable injury"—the "sine qua non of injunctive relief." *Id.* The Center and Rev. Youmans meet each factor.

## ARGUMENT

**I.  Rev. Youmans and the Center are likely to succeed on the merits of their viewpoint-discrimination claim.**

When the District punished Rev. Youmans and the Center for Rev. Youmans' speech, it engaged in "the greatest First Amendment sin"—viewpoint discrimination. *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024). Both the District's rationales for its actions are viewpoint-based, and viewpoint-based speech restrictions are presumptively unconstitutional regardless of where they occur. Because the District cannot satisfy strict scrutiny, it violated the First Amendment.

8

### A.    The District discriminated against Rev. Youmans' and the Center's speech based on viewpoint.

"[T]he First Amendment *forbids* the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Otto*, 981 F.3d at 864 (internal quotation omitted). These types of regulations, known as "viewpoint discrimination," occur "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1225 n.10 (11th Cir. 2017) (internal quotation omitted). The District provided two rationales for restricting Rev. Youmans and the Center from providing released-time education, both of which are viewpoint-based.

*First*, the District targeted a viewpoint by singling out Rev. Youmans' criticism of the Board's proposed tax increase as "offensive" and "attacking to the school." V.C. ¶¶ 135. The District didn't act against Rev. Youmans for merely speaking about the tax increase or the District; rather, the District acted in response to Rev. Youmans' "point of view"—that the proposed tax increase was unwarranted. *Otto*, 981 F.3d at 864. It was this viewpoint that the District found "offensive," but "[g]iving offense is a viewpoint." *Moms for Liberty - Brevard Cnty., FL v. Brevard Pub. Schs.*, 118 F.4th 1324, 1334 (11th Cir. 2024) (quoting *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion)). By allowing "happy-talk" and "permitting a speaker to give positive or benign comments, but not negative or even challenging ones," the District engaged in viewpoint discrimination. *Id.*

*Second*, the District's claim that Rev. Youmans' instruction "reflected a particular interpretation of the Bible rather than presenting information in a neutral or well-balanced manner" is also viewpoint-based. V.C. ¶ 154. The District is correct that Rev. Youmans' teaching is not "neutral"; he expressly teaches from an evangelical Christian perspective with the purpose of advancing certain religious beliefs. *Id.* ¶¶ 63–64. But "[r]eligion is the viewpoint from which ideas are conveyed." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 n.4 (2001) ("we

9

see no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys"). Accordingly, the Supreme Court has repeatedly condemned speech restrictions based on the speech's religious nature as viewpoint discrimination. *See*, *e.g.*, *Good News Club*, 533 U.S. at 119 (school could not exclude religious club from after-school activities); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (school could not bar church from using premises because of "religious standpoint"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 845 (1995) (university could not exclude religious newspaper from funding program). By punishing Rev. Youmans and the Center for the religious nature of their instruction, the District engaged in just the same form of viewpoint discrimination here. *See LifeWise, Inc., v. Everett Pub. Sch. Dist.*, No. 2:25-CV-02604-LK, 2026 WL 1123513, at *12 (W.D. Wash. Apr. 24, 2026) (restrictions placed on released-time education program for its religious nature amounted to unconstitutional viewpoint discrimination).

**B.    The District's viewpoint discrimination is impermissible regardless of whether or how forum analysis applies.**

Viewpoint discrimination is permitted only within one narrow category of expression—government speech. *Matal v. Tam*, 582 U.S. 218, 234 (2017). Because government speech is not at issue here, viewpoint discrimination is impermissible. This principle holds regardless of where the private speech at issue occurs. Often, the government's power to regulate speech depends on its location, *i.e.*, the relevant "forum" at issue. *Keeton v. Anderson-Wiley*, 664 F.3d 865, 871 (11th Cir. 2011). Each forum category—traditional, designated, limited, and nonpublic—has different free-speech standards. But one rule applies regardless of forum: the government may not engage in viewpoint discrimination. *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1318 (11th Cir. 2024), *cert. denied sub nom. Moats v. Jarrard*, 145 S. Ct. 2702 (2025).

Here, the District burdened speech by allowing private institutions to provide educational opportunities to Vidalia High students and then punishing those institutions for their viewpoints. Because the District "intentionally opened up" the Center's released-time education program for expressive purposes, *i.e.*, religious education, it established a designated public forum. *Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011). But because the District engaged in viewpoint discrimination—impermissible regardless of forum—the Court need not classify this permission structure as any particular forum. *Jarrard*, 115 F.4th at 1318. (Court "needn't resolve" forum dispute because bar on viewpoint discrimination "common to *all* forums"). Regardless of where the restriction took place, the District's restriction was impermissible.

### C.    The District's viewpoint discrimination fails strict scrutiny.

"[T]hough the Supreme Court has never categorically prohibited restrictions based on viewpoint, it has come close: 'Discrimination against speech because of its message is presumed to be unconstitutional.'" *Moms for Liberty*, 118 F.4th at 1332 (quoting *Rosenberger*, 515 U.S. at 828); *see also Honefund.com Inc.*, 94 F.4th (viewpoint discrimination is "likely invalid per se"). Viewpoint-based restrictions could only be justified "if the government proves that they are narrowly tailored to serve compelling state interests." *Otto*, 981 F.3d at 868. "But this standard, known as strict scrutiny, is a notoriously difficult test, one that few laws survive." *Honefund.com Inc.*, 94 F.4th at 1277; *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) ("rare that a regulation . . . will ever be permissible" under strict scrutiny).

The District's restriction here cannot survive this test. Superintendent Reid told Rev. Youmans that the District punished Youmans and the Center only because the District disagreed with their message, and parents complained. Ex. B. at 3:1–17. But stifling criticism some find offensive is not a compelling government interest. "Government may not burden speech simply because some listeners find it

11

unacceptable," and "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Moms for Liberty*, 118 F.4th at 1334 (internal quotation omitted); *Lamb's Chapel*, 508 U.S. at 395 (fears that "proselytizing" by "radical church" could "lead to threats of public unrest and even violence" could not justify viewpoint discrimination).

Even if the District had an interest in addressing Rev. Youmans' and the Center's speech, it had several less restrictive ways to do so. And "if a less restrictive means is available," then "the government must use it." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000). For example, the District could have countered or disclaimed their speech with its own expression (by emails to parents or school employees or online) or offered alternative courses at the school. But the District never proved that these would be ineffective to address its concerns.

The District's actions were also impermissibly underinclusive. *See First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 793 (1978) (underinclusivity undermines purported government interests). The District cannot justify its actions against Rev. Youmans and the Center when it allowed another religious group (Brewton-Parker) to teach from its religious viewpoint. The District has also acknowledged other religious events and allowed other groups to promote their religious views.[3] And it has refrained from punishing other community members who, like Rev. Youmans, are critical of the public education system.[4]

---

[3] J. R. Trippe Middle School (@trippe2200), FACEBOOK (Sep. 12, 2025), https://bit.ly/4tJjpab; J. R. Trippe Middle School (@trippe2200), FACEBOOK (Aug. 22, 2025), https://bit.ly/42J9CF8.

[4] Ashley Boston (@ashley.collins.7777), FACEBOOK (Mar. 19, 2026), https://bit.ly/4cWqSLE; Knee Black (@brittney.black1), FACEBOOK (Apr. 16, 2026), https://bit.ly/4dh9yT1.

Here, the District didn't impose a narrow remedy to a serious problem—it removed a Christian ministry's sole outlet for pursuing its mission because it disagreed with the ministry's message. Viewpoint discrimination in this manner does not satisfy strict scrutiny, and Rev. Youmans and the Center are thus likely to succeed on their viewpoint-discrimination claim.

### D.    The District's retaliation is unreasonable.

For the reasons explained, strict scrutiny is the most appropriate test to apply to the District's viewpoint-based retaliation. But even under the most permissive test, which is reserved for time, place, and manner restrictions in nonpublic forums, the District's retaliation is not "reasonable in light of the purpose served by the forum." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 13 (2018).[5] The District punished Rev. Youmans and the Center because their speech was "attacking to the school," non-"neutral," and not "well-balanced." V.C. ¶¶ 135, 154. Each of these phrases, however, "can be expansive" and is woefully vague. *Mansky*, 585 U.S. at 17. Because they invite "virtually open-ended interpretation," they carry "the opportunity for abuse" and fail even a reasonableness standard. *Id.* at 21 (internal quotation omitted).

### II.    Rev. Youmans and the Center are likely to succeed on the merits of their First Amendment retaliation claim.

The District's punishment of Rev. Youmans and the Center also violates the First Amendment because the District impermissibly retaliated against protected speech. The government engages in unconstitutional retaliation when: (1) "the plaintiff engaged in constitutionally protected speech"; (2) the government's "retaliatory conduct adversely affected that protected speech"; and (3) "a causal connection exists between the defendant's retaliatory conduct and the adverse effect

---

[5] As explained, because viewpoint discrimination is unlawful regardless of forum, the District's actions would trigger strict scrutiny, even in a nonpublic forum. *See Jarrard*, 115 F.4th at 1325.

on the plaintiff's speech." *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1281 (11th Cir. 2025) (citation modified). Each of these elements is met here.

### A.    Rev. Youmans engaged in constitutionally protected speech.

Rev. Youmans' Facebook posts criticizing the tax proposal are protected speech. A primary purpose of the First Amendment is "to protect the free discussion of governmental affairs;" thus, the First Amendment protects "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. State of Alabama*, 384 U.S. 214, 218–19 (1966). By urging the Board to relieve a tax burden on the community, V.C. ¶ 119, criticizing a tax increase as unnecessary, V.C. ¶ 120, and repeating a student's claim about mismanagement, V.C. ¶ 121, Rev. Youmans' political advocacy occupies "the highest rung of the hierarchy of First Amendment values," entitling it to "special protection" under the First Amendment. *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation omitted).

Rev. Youmans' and the Center's religious instruction is also constitutionally protected. "[G]overnment suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). Accordingly, "private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause." *Id.* By targeting Rev. Youmans' Bible reading, religious instruction, prayers, and all other non-"neutral" religious speech, the Board acted against constitutionally protected speech.

14

**B.     The District's retaliation adversely affected Rev. Youmans' speech.**

The District's retaliation against Rev. Youmans and the Center adversely affects their speech. The relevant question here is whether the District's retaliation "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Huggins*, 151 F.4th at 1281 (internal quotation omitted). This question is evaluated under an objective standard. *Echols v. Lawton*, 913 F.3d 1313, 1323 (11th Cir. 2019). "And since there is no justification for harassing people for exercising their constitutional rights, the adverse effect need not be great." *Id.* (internal quotation omitted). "[A]ny sort of adverse action" could suffice. *Hall v. Merola*, 67 F.4th 1282, 1294 (11th Cir. 2023).

The District's retaliation easily meets this standard. The Center's primary purpose is to provide released-time education, and the Center offers it only to students at Vidalia High. V.C. ¶ 168. By barring the Center from providing released-time education at the only school where the Center does so, the District has stifled its mission. Without the ability to carry out its mission, donations to the Center will almost certainly dry up, potentially forcing it to close. *Id.* ¶¶ 170–71. That could cost Rev. Youmans his job and primary source of income. *Id.* ¶¶ 171–72. And the cancellation of the program would harm his reputation in the community. *Id.* ¶ 176. These are far more "than de minimis inconvenience[s]," and any ordinary person would be deterred from speaking out under the circumstances. *Bennett v. Hendrix*, 423 F.3d 1247, 1253 (11th Cir. 2005).

**C.     The District retaliated against Rev. Youmans and the Center because of Rev. Youmans' speech.**

The District would not have retaliated against Rev. Youmans and the Center had Rev. Youmans not criticized the District or engaged in religious instruction. For this element, Rev. Youmans' speech must have been a "substantial" or "motivating" cause of the District's retaliation. *Gonzalez v. Trevino*, 602 U.S. 653, 662–63 (2024)

15

(Alito, J. concurring). "Because producing direct evidence of an official's inner motivations is often not possible," courts often rely on "circumstantial evidence to establish the causal link." *Huggins*, F.4th at 1282. But no circumstantial evidence is necessary here because the District said the quiet part out loud: Rev. Youmans' speech *was the reason* the District canceled the released-time program.

As Superintendent Reid made clear in her meeting with Rev. Youmans, his Facebook posts were the primary, and very likely the only reason for the District's retaliation. Superintendent Reid began the meeting by explaining that the Board decided to take action because staff and community members had complained about the posts. Ex. B at 3:2–4. She said that staff and community members were "highly offended" by them and that the Board believed there was a "misalignment" with Rev. Youmans and the Center. *Id.* at 3:12–13, 22:9–10. She added that, when she recommended to the Board that it prohibit the Center from providing released-time education, her reason was the backlash to the posts. *Id.* at 23:19–24:6. Superintendent Reid's comments make clear that the District would not have retaliated against Rev. Youmans and the Center if Rev. Youmans had not made those posts.

In light of the District's straightforward admissions, it cannot now claim "that it would have made the same decision even if the speech at issue had never taken place." *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1303 (11th Cir. 2005). Any such claim would be pretextual, including the purported concerns over parental complaints and Rev. Youmans' instruction.

Only after Rev. Youmans pressed Superintendent Reid did she add that parents at other schools had removed students over difficulty "accepting some things." Ex. B at 10:1. This tracks the concern in the Board minutes about parental complaints and non-neutral instruction. V.C. ¶ 154. But as Rev. Youmans explained to Superintendent Reid, a parent removed a student from the Center's program just

16

once at a different school *Id.* ¶ 100. That incident occurred over six years ago. *Id.* ¶ 101. And the "thing" the parent couldn't "accept" was only that the Center used versions of the Bible other than the King James Version. *Id.* ¶ 100. Not only is this an illegitimate reason to bar students from taking classes at the Center, but it also contradicts Superintendent Reid's assertion that the decision was not related to Center materials. *See* Ex. B at 10:16–17. And she only became aware of this incident after receiving complaints about the post and creating a committee to investigate the Center for those posts. *Id.* at 3:17–19. The Board, on the other hand, has known all along that the Center was teaching from a certain religious perspective. V.C. ¶ 44. On top of all this, Superintendent Reid's remedy to this purported problem of non-neutrality was to allow students to take religion courses at another religious institution. *Id.* ¶¶ 148–49. Thus, Reid's second alleged reason was at most a pretext devised by Reid to justify the Board for retaliation.

In any event, as explained above, Rev. Youmans' religious instruction is also protected speech, *supra* § II.A.; if the District did retaliate against him and the Center over it, they still engaged in unlawful retaliation. And retaliating against them for their religious exercise raises constitutional issues multiple times over. *See infra* §§ III–IV. In light of Superintendent Reid's straightforward admissions and the Board minutes, the District was substantially motivated by Rev. Youmans' speech when it retaliated against Rev Youmans and the Center.

### D.    The retaliation and discrimination against Rev. Youmans and the Center cannot even survive the *Pickering* balancing test.

When a government employee brings a First Amendment retaliation claim, he must prove two additional elements: (1) that he spoke as a private citizen on a matter of public concern, and (2) that his First Amendment interests outweigh the government's interest in the efficient promotion of public services. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (citing *Pickering v. Bd. of Ed. of*

17

*Twp. High Sch. Dist. 2025, Will Cnty. Ill.*, 391 U.S. 563 (1968)). These elements, known as the *Pickering* balancing test, are inapplicable here for the simple reason that Rev. Youmans and the Center are not District employees. But the District's actions against Youman and the Center fail the *Pickering* balancing test anyway.

### 1. The *Pickering* balancing test does not apply to Rev. Youmans' and the Center's claims.

The Pickering balancing test does not apply to Rev. Youmans' and the Center's claim for two reasons. First, Rev. Youmans and the Center "provid[e] religious instruction and pastoral care," which is not a traditional government function. *Jarrard*, 115 F.4th at 1317. Second, their relationship with the District doesn't "bear any of the traditional hallmarks of employment." *Id.* at 1318. The District does not pay Rev. Youmans or the Center, nor has it entered into a written contract with them. V.C. ¶¶ 81–82.  Rev. Youmans has no access to the Vidalia High student information system, physical premises, or email system. *Id.* ¶¶ 87–88. And the District has never overseen or reviewed the Center's course curriculum. *Id.* ¶ 86. Under these circumstances, Rev. Youmans and the enter are a far cry from "de facto employee[s]," so *Pickering* has no application here. *Jarrard*, 115 F.4th at 1318.

### 2. Rev. Youmans spoke as a private citizen on a matter of public concern.

Even applying the *Pickering* balancing test, the District's actions against Rev. Youmans and the Center violate the First Amendment. A government employee's speech may be protected under the First Amendment if he speaks as a private citizen on a matter of public concern. *Moss*, 782 F.3d at 617. "[T]he line between speaking as a citizen or as a public employee turns on whether the speech 'owes its existence to a public employee's professional responsibilities.'" *Carollo v. Boria*, 833 F.3d 1322, 1329 (11th Cir. 2016) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Rev. Youmans' speech on the tax increase occurred on his personal Facebook page, he posted it outside of work hours, and it was unrelated to the

18

functioning of the Center. Accordingly, Rev. Youmans did not speak "pursuant to his ordinary job duties" as the Executive Director of the Center. *Id.* at 1330.

Rev. Youmans' speech is also strikingly similar to that speech in *Pickering* itself—the seminal case protecting employee speech on matters of public concern. In that case, a teacher wrote a letter to the editor criticizing her school board's handling of a bond issue and the Board's allocation of financial resources. *Pickering*, 391 U.S. at 565–66. The Court held that "the question whether a school system requires additional funds is a matter of legitimate public concern." *Id.* at 571. Just like the letter in *Pickering*, Rev. Youmans' posts "attack[ed] the School Board's handling" of a tax increase and its "allocation of financial resources." *Id.* at 566. Accordingly, he also spoke on a matter of public concern.

Rev. Youmans' instruction, unlike his Facebook posts, does constitute an official duty at the Center. But as explained, his instruction was likely a pretext for retaliating against his Facebook posts. And under Eleventh Circuit precedent, imparting a particular religious viewpoint to students cannot be a government duty. *See Jarrard*, 115 F.4th at 1317–18. Thus, *Pickering* cannot apply.

### 3. Rev. Youmans' and the Center's First Amendment interests outweigh any alleged efficiency interests.

The government may restrict a public employee's private speech on a matter of public concern only if it demonstrates that its interests in "the effective and efficient fulfillment of [its] responsibilities to the public" outweigh the employee's interests in free speech. *Lane v. Franks*, 573 U.S. 228, 242 (2014) (internal quotation omitted). Because Rev. Youmans' speech "more substantially involve[s] matters of public concern," the Board must make "a stronger showing [of government interests]." *Id.* (internal quotation omitted).

Rev. Youmans' speech in no way impeded government functioning. He made the Facebook posts "off-duty and away from work." *Labriola v. Miami-Dade Cnty.*,

19

142 F.4th 1305, 1310 (11th Cir. 2025). And after he made them, nothing changed at the Center or Vidalia High—students continued to take courses at both without disruption. The only consequence of Rev. Youmans' speech, according to Superintendent Reid, is that teachers and community members complained to her about the posts. Ex. B at 3:2–4. But mere disagreement with Rev. Youmans' speech is not an interest that justifies silencing it. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 783 (9th Cir. 2022) ("That some may not like the political message being conveyed is par for the course and cannot itself be a basis for finding disruption of a kind that outweighs the speaker's First Amendment rights.").

Even if these complaints had manifested into some form of on-campus disruption, "the adverse reactions of students and staff" cannot "operate[] as an impermissible 'heckler's veto' that restricts speech based on a hostile audience reaction." *Reges v. Cauce*, 162 F.4th 979, 1001 (9th Cir. 2025). Any complaints that Superintendent Reid received could not create the kind of inefficiencies that justify restricting speech on a matter of public concern.

### III. Rev. Youmans and the Center are likely to succeed on the merits of their Free Exercise claim.

To the extent the District retaliated against Rev. Youmans and the Center over "concerns about the course content, specifically a perception that some instruction reflected a particular interpretation of the Bible rather than presenting information in a neutral or well-balanced manner," V.C. ¶ 154, it violated the Free Exercise Clause. It did so for two reasons. First, the District impermissibly punished Rev. Youmans and the Center for their religious character and exercise. Second, the District's actions against Rev. Youmans and the Center were not neutral or generally applicable.

20

### A.    The District discriminated based on religious status and exercise.

The Free Exercise Clause forbids "indirect coercion or penalties on the free exercise of religion" just as much as "outright prohibitions." *Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 778 (2022) (internal quotation omitted). And the Supreme Court held three times in five years that the government violates the Free Exercise Clause when it excludes religious observers from "otherwise available public benefits" because of their religious character or exercise. *Id.*; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020).

In *Trinity Lutheran*, the Supreme Court held that a state could not exclude "otherwise eligible" churches from a playground resurfacing program because of the churches' "religious character." 582 U.S. at 462. In *Espinoza*, the Court held the same for a state program giving tax credits for private-school scholarships. 591 U.S. at 487. The state could not bar "religious schools from public benefits solely because of the religious character of the schools." *Id.* at 476. And in *Carson*, the Court went further, holding that Maine could not exclude religious schools from a tuition assistance program based on their religious use of state funds. 596 U.S. at 787.

The "unremarkable principles" from those cases decide this one. *Id.* at 780 (citation modified). Vidalia High's released-time education program is a *benefit* because it gives local religious leaders the opportunity to provide religious instruction to students who couldn't otherwise receive it at public school. And it is a *public* benefit because it is offered to eligible institutions within the community.

The District rescinded this benefit, however, because of how the Center is "educating young people in their faith, inculcating its teachings, and training them to live their faith." *Id.* at 787. Specifically, the District would only permit the Center to provide instruction if it did so "in a neutral or well-balanced manner." V.C. ¶ 154.

In other words, the District denied Rev. Youmans and the Center "an otherwise generally available public benefit because of their religious exercise." *Carson*, 596 U.S. at 782. But that religious exercise—providing education from a *religious* viewpoint—is the Center's entire purpose. *Id.* ¶ 62. So the only way the Center could comply with the District's espoused neutrality requirement would be to abandon this purpose and "disavow its religious character." *Trinity Lutheran*, 582 U.S. at 463. Such religious discrimination is "odious to our Constitution" and subject to "the strictest scrutiny." *Carson*, 596 U.S. at 779–80 (quoting *Trinity Lutheran*, 582 U.S. at 467).

**B.    The District's neutrality requirement is not neutral or generally applicable.**

The District's actions also violate the Free Exercise Clause because they are not neutral or generally applicable. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Phila., Pa.*, 593 U.S. 522, 533 (2021). And any "government intrusion" into the "the right of churches and other religious institutions to decide matters of faith and doctrine" would "obviously violate the free exercise of religion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (internal quotation omitted). By retaliating against the Center for its choice of Bible translation and because its teaching was not "neutral" or "well balanced," V.C. ¶ 154, the District engaged in just such an intrusion, "proceed[ing] in a manner intolerant of religious beliefs" that was neither neutral nor generally applicable. *Fulton*, 593 U.S. at 533; *see also LifeWise*, 2026 WL 1123513, at *15 (deviation from standard process for religious released-time education program was not neutral or generally applicable).

Nor does this distinction between neutral and non-neutral education advance the District's interest in addressing parental complaints. *See Tandon v. Newsom*,

593 U.S. 61, 64 (2021) (differing COVID-19 regulations between religious and secular institutions unjustified in light of interest in reducing viral spread). The one parent who removed a student from the Center over its choice of Bible did so over six years ago at another high school. V.C. ¶¶ 100–01. On the other hand, countless parents and students have applauded the Center for its religious character. *Id.* ¶¶ 94–99. Restricting that character will thus do nothing to remedy the complaint at issue, while likely raising new complaints from community members who support Rev. Youmans and the Center.

Government action is also not neutral or generally applicable when it treats some religious beliefs differently from others. *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 248 (2025); *Fowler v. State of R.I.*, 345 U.S. 67, 70 (1953). While the District canceled the released-time program with the Center, it replaced it with dual-enrollment courses from Brewton-Parker Christian University. V.C. ¶ 148. But Brewton-Parker is also a religious institution that teaches from a religious perspective.[6] The District has thus discriminated between two different religious institutions without advancing any interest in neutrality.

**C.     The District cannot satisfy strict scrutiny.**

For the reasons explained above, *supra* § I.C., the District's actions do not satisfy strict scrutiny. To the extent the District seeks "neutral" instruction to advance an interest in avoiding Establishment Clause concerns, "that interest cannot qualify as compelling." *Trinity Lutheran*, 582 U.S. at 466. Nor is the District's restriction narrowly tailored to advancing any interest in preserving a perception of neutrality. Here, there is no government speech at issue, and Center

---

[6] Brewton-Parker Christian University, *Course Descriptions*, http://bit.ly/4vH8Wxl (last visited May 4, 2026) (students develop "hermeneutical methods and tools used in discovering the meaning and application of the New Testament for teaching and preaching" through New Testament Introduction and Interpretation course).

instruction occurs off-campus and only with parental consent, so the risk of misconstruing the District's position is minimal at best. And the District could always disavow the Center's viewpoint. *See Good News Club*, 533 U.S. at 113–15 (school's ban on religious club unjustified by neutrality concerns where parental consent was required and club leaders were not school teachers).

IV.    **Rev. Youmans and the Center are likely to succeed on the merits of their Georgia Religious Freedom Restoration Act claim.**

Under the Georgia Religious Freedom Restoration Act ("GRFRA"), government action that substantially burdens the free exercise of religion must satisfy strict scrutiny, even if the burden results from a generally applicable rule. Ga. Code § 50-15A-1. GRFRA defines "exercise of religion" as "any exercise of religion, whether or not compelled by, or central to, a system or religious belief, but not limited to, the practice or observance of religion under" the Georgia and United States Constitutions. *Id.* § 50-15A-2. A "substantial burden" is "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior." *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 831 (11th Cir. 2020) (interpreting identical language in the Religious Land Use and Institutionalized Persons Act). "[M]odified behavior, if the result of government coercion or pressure, can be enough." *Id.* And a state burdens religion when it "denies [an important] benefit because of conduct mandated by religious belief." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981).

Rev. Youmans' and the Center's religious instruction constitutes religious exercise. *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025) ("for many [believers], the religious education of children is not merely a preferred practice but rather a religious obligation"). And the District has substantially burdened their religious exercise by putting them to a coercive choice: give up the religious nature of their teaching or lose their released-time education program. *See LifeWise*, 2026 WL

24

1123513, at \*15 (inability of students to attend religious released-time education program constituted burden on program's religious exercise). Conditioning this public benefit on ending the Center's religious instruction triggers strict scrutiny. To make that burden worse, Rev. Youmans and the Center face the loss of the Center's existence, fundraising streams, and their reputation in the community. V.C. ¶¶ 169–76. Any of these imposes a sufficient burden to trigger strict scrutiny, and the District cannot satisfy that burden, as explained above.

## V.    Rev. Youmans and the Center are likely to prevail on the remaining preliminary injunction factors.

Because Rev. Youmans and the Center have demonstrated likely success on their First Amendment claims, "[t]hey also meet the remaining [preliminary injunction] requirements as a necessary legal consequence." *Otto*, 981 F.3d at 870. Start with harm. "It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983). Because of Rev. Youmans' and the Center's protected speech and religious exercise, the District has barred them from pursuing their mission of providing released-time education to Vidalia High students. V.C. ¶ 168. Such "a direct reaction to [the] exercise of [their] First Amendment rights" inflicts irreparable harm warranting an injunction. *Kadalie v. Bd. of Regents of Univ. Sys. of Ga.*, No. CV404-101, 2005 WL 8156251, at \*3 (S.D. Ga. July 18, 2005). As for the third and fourth preliminary injunction requirements—damage to the opposing party and the public interest— they merge because defendants are government entities. *Otto*, 981 F.3d at 870. And neither the public nor the government has any interest in the latter violating the Constitution. *Id.* So a preliminary injunction should issue here. *Id.*

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

**/s/ Keri M. Martin**

Keri M. Martin (GA Bar No. 679803)
Hall, Gilligan, Roberts & Shanlever, LLP
7402 Hodgson Memorial Drive, Suite 110
Savannah, Georgia 31406
Telephone: (912) 777-6636
Email: kmartin@hgrslaw.com

Philip A. Sechler (DC Bar No. 426358)*
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
psechler@ADFlegal.org

Mercer S. Martin (AZ Bar No. 038138)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
mmartin@ADFlegal.org

*Counsel for Plaintiffs*
*\*Pro Hac Vice application pending*

## CERTIFICATE OF SERVICE

I hereby certify that on May 08, 2026, I electronically filed the foregoing using the CM/ECF system, and will serve the same with Plaintiffs' Verified Complaint on the following parties:

Vidalia City Schools, Sandy Reid, Andy Blount, Sadia Ajohda, Brittney Black, Fred Godbee, and Julee Torrance

1001 North Street, West
Vidalia, GA 30474

Dated: May 08, 2026

**/s/ Keri M. Martin**
Counsel for Plaintiffs

26